# In the United States Court of Federal Claims

No. 21-1965

(Filed: 11 August 2023[*])

***************************************
KATHERINE HUNTOON,                     *
                                       *
                  Petitioner,          *
                                       *
v.                                     *
                                       *
THE UNITED STATES,                     *
                                       *
                  Respondent.          *
                                       *
***************************************

*Sean Franks Greenwood,* The Greenwood Law Firm, of Houston, TX, for petitioner.

*Benjamin Patrick Warder*, Trial Attorney, with whom were *Gabrielle M. Fielding*, Assistant Direction, *Heather L. Pearlman*, Deputy Director, *C. Salvatore D'Alessio*, Director, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Torts Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for respondent.

## OPINION AND ORDER

**HOLTE, Judge.**

Katherine Huntoon, a petitioner with pre-existing multiple sclerosis, received the influenza ("flu") vaccine on 2 October 2018. The same day she received the shot, Ms. Huntoon began feeling dizzy. Two days later, on 4 October 2018, at a routine visit for her multiple sclerosis, she was diagnosed with cerebellar ataxia, a sudden inability to coordinate muscle movement due to injury to the cerebellum. Ms. Huntoon filed a petition alleging her cerebellar ataxia was caused by the flu vaccine. Pursuant to § 16(a)(2) of the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act"), 42 U.S.C. §§ 300aa-1 to -34, the three-year statute of limitations begins to run from the "first symptom or manifestation of onset."[1] On 31 January 2023, Chief Special Master Brian H. Corcoran dismissed the petition as untimely, finding "relevant contemporaneous medical records clearly indicate that petitioner's symptoms began before [4 October 2018]," so petitioner filed at least a day late. *Huntoon v. Sec'y of Health & Hum. Servs.*, No. 21-1965V, 2023 WL 2231842 at *4 (Fed. Cl. Special Mstr. Feb. 27, 2023).

---

[*] This Opinion and Order was initially filed under seal on 28 July 2023 pursuant to Vaccine Rule 18(b) of the Rules of the Court of Federal Claims ("VRCFC"). The Court provided the parties 14 days to submit proposed redactions, if any, before the Opinion and Order was released for publication. Neither party proposed redactions nor indicated there were no redactions by 11 August 2023, the 14-day deadline. This Opinion and Order is now reissued for publication in its original form.
[1] 42 U.S.C. § 300aa-16(a)(2).

Petitioner moved for review of Chief Special Master's 31 January 2023 decision contending the Chief Special Master's decision was arbitrary and capricious because the decision ignored medical evidence in the record. Petitioner further argued the Chief Special Master erred in not allowing equitable tolling. While the outcome of a day-late deadline is harsh, the Vaccine Act's mandate for symptom onset timing allows no other option—*verbis legis tenaciter inhaerendum*. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: INTERPRETATIONS OF LEGAL TEXTS, at v (2012) (translating the Latin phrase to read "Hold tight to the words of the law") (fittingly the lead epigraph to *Reading Law*, capturing the paramount task of judges when interpreting legal texts: giving enacted language its soundest meaning); *see also Lamie v. United States Tr.*, 540 U.S. 526, 538 (2004) ("Our unwillingness to soften the import of Congress' chosen words even if we believe the words to lead to a harm outcome is longstanding."). For the following reasons, the Court denies petitioner's Motion for Review and sustains the decision of the Chief Special Master.

**I.    Petitioner's Medical History and Vaccination**

As the facts have not changed since the beginning of the year, the Court's recitation of the factual history draws from the Chief Special Master's 31 January 2023 Decision Granting Respondent's Motion to Dismiss, ECF No. 26 ("Decision Granting Resp't Mot. to Dismiss"); petitioner's 1 March 2023 Motion for Review, ECF No. 28 ("Pet'r Mot. for Review"); and respondent's 31 March 2023 Response to Motion for Review, ECF No. 30 ("Resp't Resp. to Pet'r Mot. for Review"). Petitioner's pre-vaccination history included multiple sclerosis ("MS"). Decision Granting Resp't Mot. to Dismiss at 2. Initial screening from 2017 revealed Ms. Huntoon experienced balance problems and dizziness prior to her MS diagnosis (from approximately 1991 to 2000), and during multiple visits to her neurologist in 2017 (14 February 2017; 17 March 2017; 20 April 2017; 16 May 2017; and 20 June 2017), and, on 2 August 2018, petitioner exhibited a mildly ataxic gait upon examination. Resp't Resp. to Pet'r Mot. for Review at 2 (citing Pet'r Ex. 2 at 146–65, 201–04).

On 2 October 2018, petitioner received a flu vaccination during her annual physical examination. Decision Granting Resp't Mot. to Dismiss at 2. On the car ride home following her examination, petitioner felt "somewhat dizzy but otherwise alright." *Id.* (citing Pet'r Ex. 20 at 1). On 4 October 2018, petitioner underwent a routine MS appointment with her neurologist, Dr. Bharathy Sundaram, and reported experiencing "excessive fatigue" the past three weeks and "excessive dizziness" after receiving the flu vaccination two days earlier. *Id.* (citing Pet'r Ex. 2 at 187). Dr. Sundaram noted petitioner had acute onset of vertigo, gait changes, headache, fever, and extreme fatigue and subsequently diagnosed her with cerebellar ataxia on 4 October 2018. *Id.* (citing Pet'r Ex. 2 at 192). Ms. Huntoon was directed to the emergency room ("ER") following the cerebellar ataxia diagnosis. *Id.* (citing Pet'r Ex. 2 at 192). Petitioner was subsequently admitted to Texoma Medical Center ("TMC") from 4 October 2018 to 11 October 2018 under the care of Dr. Meena Betha who diagnosed petitioner with ataxia associated with dizziness. *Id.* (citing Pet'r Ex. 3 at 355).

On 5 October 2018, while admitted at TMC, petitioner had a neurology consultation with Dr. Shyama Satyan. Decision Granting Resp't Mot. to Dismiss at 3 (citing Pet'r Ex. 3 at 370–72). Dr. Satyan stated petitioner's ataxia started on Tuesday night, 2 October 2018, and was

secondary to post vaccine and a possible cause of the exacerbation of Ms. Huntoon's MS. *Id*. (citing Pet'r Ex. 3 at 371). A magnetic resonance imaging of the cervical spine performed on 4 October 2018 did not reveal enhancement of MS-related lesions. *Id*. (citing Pet'r Ex. 2 at 327).

On 11 October 2018, nurse practitioner Emmy Kirui-Modi conducted a neurological examination on petitioner and included "[a]cute cerebellar ataxia-suspect secondary to recent flu vaccine." *Id*. (citing Pet'r Ex. 3 at 412). Petitioner was discharged from the ER and transferred to Carrus Rehabilitation Hospital for inpatient rehabilitation from 11 October 2018 to 16 October 2018. *Id*. (citing Pet'r Ex 3 at 345–52; Pet'r Ex. 4 at 39). Petitioner attended subsequent medical appointments for imaging and hospitalizations unrelated to her cerebellar ataxia throughout October 2016 and until June 2021. *Id*.

## II.     Petitioner and Procedural History

The petition was formally received by the Clerk of Court on 5 October 2021. *See* Pet., ECF No. 1. Petitioner's counsel claims to have filed the petition on 4 October 2021, around 9:00 pm (CST) using the Public Access to Court Electronic Records ("PACER") system. Decision Granting Resp't Mot. to Dismiss at 3. Respondent filed a Rule 4(e) Report and a motion to dismiss on 12 August 2022, claiming the case is untimely because "[p]etitioner filed her claim after the expiration of the statutorily prescribed limitations period set forth in Section 16(a)(2) of the Vaccine Act" and "has not demonstrated the extraordinary circumstances necessary to equitable toll the Vaccine Act's statute of limitations." Resp't Mot. to Dismiss & Rule 4(c) Report at 4 (citing 42 U.S.C. § 300aa-16(a)(2)), ECF No. 22. Petitioner responded on 23 September 2022. Pet'r Resp. to Resp't Mot. to Dismiss, ECF No. 24. Respondent replied on 7 October 2022, ECF No. 25. On 31 January 2023, the Chief Special Master granted respondent's Motion to Dismiss. Decision Granting Resp't Mot. to Dismiss at 7. Pursuant to Rule 23 of the Vaccine Rules of the Court of Federal Claims ("VRCFC"), petitioner filed a Motion for Review of the Chief Special Master's decision on 1 March 2023. Pet'r Mot. for Review. Respondent responded on 31 March 2023. Resp't Resp. to Pet'r Mot. for Review. The Court held oral argument on 14 July 2023. *See* Order Setting Oral Argument, ECF No. 31; Oral Argument Tr. ("Tr."), ECF No. 33.

## III.    Applicable Law

The Vaccine Act provides this Court jurisdiction to review a special master's decision upon timely motion of either party. *See* 42 U.S.C. § 300aa-12(e)(1)–(2). In reviewing the record of the proceedings before the special master, the Court may: (1) "uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision"; (2) "set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law"; or (3) "remand the petition to the special master for further action in accordance with the court's direction." *Id.* § 300aa-12(e)(2). "Fact findings are reviewed . . . under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard." *Saunders v. Sec'y of Dept. of Health & Hum. Servs.*, 25 F.3d 1031, 1033 (Fed. Cir. 1994) (quoting *Munn v. Sec'y of Dept. of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992)).

It is not the Court's role "to reweigh the factual evidence, or to assess whether the special master correctly evaluated the evidence." *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000) (quoting *Munn*, 970 F.2d at 871). The Court also does "not examine the probative value of the evidence or the credibility of the witnesses. These are all matters within the purview of the fact finder." *Id.* (quoting *Munn*, 970 F.2d at 871). "Reversal is appropriate only when the special master's decision is arbitrary, capricious, an abuse of discretion, or not in accordance with the law." *Snyder ex rel. Snyder v. Sec'y of Dept. of Health & Hum. Servs.*, 88 Fed. Cl. 706, 718 (2009). The arbitrary and capricious standard "is a highly deferential standard of review": "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines ex rel. Sevier v. Sec'y of Dept. of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991).

## IV. Review of the Special Master's Decision

### A. The Chief Special Master's Determination of Petitioner's Onset

In his 31 January 2023 decision, the Chief Special Master reiterated, "[O]nset is measured from first manifestation of symptom, regardless of whether it is understood in that manner—or whether additional symptoms['] progression confirming the diagnosis occur later in sequence." Decision Granting Resp't Mot. to Dismiss at 5 (citing 42 U.S.C. § 300aa-16(a)(2); *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1335, 1340 (Fed. Cir. 2011)). In determining petitioner's onset of cerebellar ataxia occurred prior to 4 October 2018, the Chief Special Master credited the medical records and Ms. Huntoon's affidavit statements documenting petitioner's dizziness on the day she received the vaccine to deduce an onset date prior to 4 October 2018. *Id.* (citing Pet'r Ex. 2 at 187, 192; Pet'r Ex. 3 at 355, 370–71; Pet'r Ex. 20 at 1). The Chief Special Master used information on ataxia from the Mayo Clinic to support dizziness as a symptom of cerebellar ataxia. *Id.* (citing *Ataxia: Symptoms & causes*, MAYO CLINIC (Apr. 9, 2022), https://www.mayoclinic.org/diseases-conditions/ataxia/symptoms-causes/syc-20355652) ("Ataxia: Symptoms & causes"). The Chief Special Master also noted the "treaters considered [p]etitioner's complains [sic] of dizziness to represent ataxia." *Id.* Additionally, the Chief Special Master looked at the date of Ms. Huntoon's first diagnosis of acute cerebellar ataxia on 4 October 2018 to deduce petitioner's "symptoms had to have manifested" by the time petitioner was diagnosed on 4 October 2018. *Id.* (citing Pet'r Ex. 2 at 192).

The Chief Special Master rejected petitioner's argument on the timeframes for cerebellar ataxia being medically acceptable in previous cases. *See id*. (citing *Stewart v. Sec'y of Health & Hum. Servs.*, No. 06-287V, 2007 WL 1032377 at *16 (Fed. Cl. Special Mstr. Mar. 19, 2007)). The Chief Special Master reasoned "though petitioner points to timeframes for cerebellar ataxia that have been deemed medically acceptable in previous cases, they do not determine petitioner's onset date *in this* case." Decision Granting Resp't Mot. to Dismiss at 5. The Chief Special Master determined the medical records "clearly indicate that [p]etitioner's symptoms began before [4 October 2018]." *Id*. The Chief Special Master found the record showed no inconsistencies between witness statements and the record warranting a different onset. *Id*. at 6.

The Chief Special Master concluded the evidence in the record preponderantly supported an onset date prior to 4 October 2018. *Id.* at 5–6.

### B. The Chief Special Master Rejection of Equitable Tolling Applicability

After determining Ms. Huntoon's symptoms likely began on 2 October 2018 or 3 October 2018, the Chief Special Master determined Ms. Huntoon needed to file the petition before 4 October 2021; petitioner filed no sooner than 5 October 2021 according to the Court's "Case Management/Electronic Case Files" docket entry. *Id.* at 6. The Chief Special Master then analyzed whether equitable tolling was appropriate. *Id.* The Chief Special Master reasoned "not only do the present circumstances not involve a comparable error beyond petitioner's control, but even a [4 October 2018] filing date would have been untimely—since the alleged filing system failure would have occurred after the running of the limitations period." Decision Granting Resp't Mot. to Dismiss at 6.

The Chief Special Master rejected petitioner's argument for mental incapacity providing a basis for equitable tolling. *Id.* While petitioner referenced her medical history to support her general mental incapacity, the Chief Special Master, analyzed other cases permitting equitable tolling and found the "impact of her medical suffering [did] not . . . rise to the level of kind of mental capacity" warranting equitable tolling. *Id.* at 6–7. The Chief Special Master found petitioner did not demonstrate she was incapable of "rational thought or deliberate decision making," or "incapable of handling [her] own affairs or unable to function [in] society" during a three-year period after 2 October 2018 or 4 October 2018. *Id.* at 6 (citing *Barrett v. Principi*, 363 F.3d 1316, 1321 (Fed. Cir. 2004)).

The Chief Special Master acknowledged the Vaccine Program embodies a "pro-claimant regime meant to allow injured individuals a fair and fast path to compensation." *Id.* at 7 (citing *Cloer*, 654 F.3d at 1325). The Chief Special Master clarified the doctrine of equitable tolling is to be used sparingly. *Id.* (citing *Irwin*, 498 U.S. at 96). As petitioner failed to demonstrate both diligence and extraordinary circumstances, the Chief Special Master concluded equitable tolling was not warranted and dismissed petitioner's claim as untimely. Decision Granting Resp't Mot. to Dismiss at 7.

### V. Party Arguments

On 1 March 2023, petitioner moved for review of the Chief Special Master's 31 January 2023 Decision Granting Motion to Dismiss. *See* Pet'r Mot. for Review . In the accompanying memorandum in support of petitioner's Motion for Review, petitioner makes two objections: (1) "The Chief Special Master committed error when determining Petitioner's onset of Cerebella[r] Ataxia before 4 October 2018"; and (2) "The Chief Special Master committed error when determining that Petitioner did not meet the requirements to allow for equitable tolling." Pet'r Mem. in Supp. of Mot. for Review at 1, ECF No. 28-1. The Court summarizes the parties' arguments for each objection in turn.

### A. Petitioner's Onset of Cerebellar Ataxia before 4 October 2018

Petitioner first objects to the Chief Special Master's determination of petitioner's onset of cerebellar ataxia occurring before 4 October 2018.  *Id.* at 6.  Petitioner argues a symptom and a manifestation of onset are distinguishable.  *Id*. at 6–7 (citing *Markovich v. Dep't of Health and Hum. Servs.*, 477 F.3d 1353 (Fed. Cir. 2007)).  Petitioner contends the Chief Special Master's reliance on a single symptom of dizziness to support his finding of manifestation, which ultimately triggered the limitations period, was erroneous.  *Id*. at 7.  Petitioner also points to two occasions in the record to suggest the Chief Special Master conceded the injury could have occurred before the vaccination by noting some dizziness in the medical record.  *Id*. at 9 (citing Pet'r Ex. 3 at 361-64, 455-63, 846).  Petitioner contends the history of dizziness only solidifies the symptom is not indicative of onset because it "may be associated with more than one condition."  *Id*. at 6.  Focusing on the symptom itself, petitioner asserts dizziness is vague and can be associated with a myriad of issues, therefore the Chief Special Master erred in applying dizziness exclusively with ataxia.  Pet'r Mem. in Supp. of Mot. for Review at 7.

Petitioner further underlines the Chief Special Master's error in relying on one article listing "poor coordination, loss of balance, and difficulty walking," when other articles do "not mention dizziness as a symptom."  *Id*. (internal quotation marks omitted).  The diagnostic criteria described in the articles presented by petitioner depict mobility and gait issues; they do not mention dizziness as a symptom of cerebellar ataxia.  *Id*. at 7.  Petitioner maintains experiencing dizziness on the day of the vaccination is "not evidence of anything."  *Id*. at 7.

Citing *White v. Secretary of Health and Human Services*, petitioner also asserts the Chief Special Master should have looked at a "significant shift of symptomology . . . beyond simple dizziness/lightheadedness" as the trigger for the statute of limitations.  *Id*. at 7-8 (citing *White v. Sec'y of Health & Hum. Servs.*, No. 04-337V, 2011 WL 6176064, at *33-34 (Fed. Cl. Nov. 22, 2011).  According to petitioner, symptoms on 4 October 2018 worsened and "went beyond simple dizziness/lightheadedness," so the onset should have been later than what the Chief Special Master determined.  *Id*.  Petitioner proposes the onset occurred after 5 October 2018 because it marks the start of severe headaches, numbness/tingling in her extremities, and abnormal electrocardiogram readings.  Pet'r Mem. in Supp. of Mot. for Review at 9 (citing Pet'r Ex. 3 at 361-64, 846).

Petitioner also argues the Chief Special Master's finding the injury occurred on the date of the vaccination flies "in the face of so much evidence to the contrary," and petitioner "should have been allowed to litigate onset, testify, and provide expert testimony."  *Id*. at 8.  Cerebellar ataxia symptoms and findings would verify petitioner's argument for an onset date of 5 October 2018, but the Chief Special Master did not hear evidence relating to the higher pain levels and loss of reflex as symptoms.  *Id*. at 9.  If the Chief Special Master heard such evidence, according to petitioner, she would not need to argue equitable tolling at all.  *Id*.

Pointing to the Federal Circuit, respondent highlights "[t]he statute of limitations in the Vaccine Act begins to run on the date of occurrence of the first symptom or manifestation of onset of the vaccine-related injury for which compensation is sought, and the symptom or manifestation of onset must be recognized as such by the medical profession at large."  Resp't Resp. to Pet'r Mot. for Review at 6 (citing *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011)).  Moreover, respondent asserts the Chief Special Master was

correct in holding the statute of limitations can be triggered either by a 'symptom' or a 'manifestation of onset,' whichever comes first. See *id*. (citing 42 U.S.C. § 300aa-16(a)(2)). Respondent highlights the Chief Special Master's explanation: "onset is measured from first manifestation of symptom, regardless of whether it is understood in that manner." *Id*. (citing §42 U.S.C. § 300aa-16(a)(2); *Cloer*, 654 F.3d at 1335, 1340). Respondent cites "Ataxia: Diagnosis & treatment" from Mayo Clinic's website, which lists dizziness as a symptom, and the Chief Special Master agreed it could be a symptom of ataxia. *Id*. at 10 (citing *Ataxia: Diagnosis & treatment*, MAYO CLINIC (Apr. 9, 2022), https://www.mayoclinic.org/diseases-conditions/ataxia/diagnosis-treatment/drc-20355655).

Respondent further asserts the Chief Special Master's determination of an onset prior to 4 October 2018 was supported by the record. *Id.* at 6. Respondent asserts the record demonstrates petitioner met with Dr. Satyan, at TMC, who noted petitioner's dizziness "started on Tuesday night," 2 October 2018. *Id*. at 7 (citing Pet'r Ex. 3 at 371). Respondent also highlights Ms. Huntoon stated to multiple medical professionals she became dizzy on the day she received the flu vaccination, 2 October 2018, and reiterated her position in her affidavit dated 20 October 2021. Resp't Resp. to Pet'r Mot. for Review at 7. Respondent contends Ms. Huntoon's symptoms had to have manifested by 4 October 2018 to have been diagnosed by 4 October 2018. *Id*. at 8. Respondent further defends the Chief Special Master's decision by highlighting the absence of inconsistencies between medical records or witness statements. *Id*. at 10–11 (citing *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378 (Fed. Cir. 2021)). Based on the record, respondent asserts the Chief Special Master is correct in determining petitioner's onset began before 4 October 2018.

Respondent explains the Chief Special Master "may decide a case on the basis of written submissions without conducting evidentiary hearing," but is not required to do so as petitioner contends. *Id*. at 11 (citing VRCFC 8(d); *Kreizenbeck v. Sec'y of Health & Hum. Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020)). Further, respondent argues petitioner did not request a hearing. *Id*. Respondent asserts the Chief Special Master did not act in an arbitrary manner as the determination of onset is "overwhelmingly supported by the weight of the record evidence." *Id*. at 12.

### B.     Applicability of Equitable Tolling

Petitioner asserts the Chief Special Master erred in determining petitioner did not meet the requirements for equitable tolling. Pet'r Mem. in Supp. of Mot. for Review at 10. Petitioner argues equitable tolling should be broadly construed to allow injured individuals a fast and fair path to compensation. *Id*. at 11 (citing *K.G. v. Sec'y of Health & Hum. Servs.*, 951 F.3d 1374, 1380 (Fed. Cir. 2020)). Petitioner highlights the two elements required for equitable tolling: (1) diligent pursuit of her rights; and (2) extraordinary circumstances prevented timely filing. *Id*. at 10-11 (citing *K.G.*, 951 F.3d at 1381).

For the first element—diligence—petitioner asserts she pursued her rights since being vaccinated in October 2018. *Id*. at 12. Petitioner explains for two years following the vaccination, petitioner was diagnosed with a myriad of medical ailments, which affected her

general mental capacity. *Id.* Petitioner contends she exercised as much diligence as can be expected from a reasonable person with her conditions. *Id*. at 13.

For the second element—extraordinary circumstances—petitioner cites various cases to assert a court filing system failure warrants equitable tolling. *See* Pet'r Mem. in Supp. of Mot. for Review at 11–12 (citing *Capital Tracing, Inc. v. United States*, 63 F.3d 869, 862-63 (9th Cir. 1995) (lack of clarity in law); *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 239 (3rd Cir. 1999) (attorney affirmatively lied to diligent client); *Pliler v. Ford*, 542 U.S. 225 (2004) (O'Connor, J., concurring) (judicial and governmental interference); *Sherwood v. Prelesnik*, 579 F.3d 581 (6th Cir. 2009) (reasonable reliance on then-binding circuit precedent)). Petitioner contends she filed her case on 4 October 2018, but the PACER system malfunctioned, so the filing date indicates 5 October 2018. *Id.* at 13–14. Petitioner emphasizes attorney, Anna Carruth, has extensive experience filing all manner of documents, did not receive confirmation for the filing fee. *Id.* Petitioner adds Ms. Carruth conversed with the Court's information technology help desk to inquire about a possible outage; the desk "could not confirm or deny an outage." *Id*. at 14. Petitioner argues the court's decision in *Mojica v. Secretary of Health and Human Services*, which found the failure of a commercial overnight delivery service was an extraordinary circumstance, is similar to petitioner's circumstances. *Id.* at 15 (citing *Mojica v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 96, 100 (2011)). Petitioner maintains "a breakdown of the court's filing system is no different" than a failure of a commercial overnight delivery service, and "[i]t presented an insurmountable obstacle to getting the case timely filed." *Id.* at 12. Highlighting *Mojica*, petitioner explains "preventing a petitioner from pursuing a case because the court-mandated electronic filing system failed would not further this [equitable tolling] aim." Pet'r Mem. in Supp. of Mot. for Review at 11, 15-16 (citing *Mojica*, 102 Fed. at 101). Due to the PACER error, petitioner contends the Chief Special Master erred in finding the system failure was not an extraordinary circumstance. *Id*. at 16.

Respondent argues petitioner's claim was untimely and not subject to equitable tolling. *See* Resp't Resp. to Pet'r Mot. for Review at 12. Respondent first explains to comply with the statute of limitations, petitioner must have filed the claim by 4 October 2018 and because the claim was filed "no sooner than [5 October 2021]," the claim is untimely. *Id.* Despite petitioner's assertion the Chief Special Master erred in determining the claim is not subject to equitable tolling, respondent contends the Federal Circuit has held equitable tolling is "to be used 'sparingly' and only in 'extraordinary circumstance[s].'" *Id.* at 13 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Respondent argues the circumstances here do not support the application of equitable tolling. *See id.* at 17.

Respondent rejects petitioner's argument for equitable tolling based on mental incapacity. *See id.* at 16. Respondent asserts petitioner provided no evidence she was "incapable of handling [her] own affairs or unable to function [in] society at any point during the three-year limitation period. *Id*. (internal quotation marks omitted) (citing Decision Granting Resp't Mot. to Dismiss at 6). Respondent argues petitioner retained counsel one-and-a-half years before the statute's deadline, supporting her mental competency. Resp't Resp. to Pet'r Mot. for Review at 17. As there is no evidence petitioner suffered from a mental incapacity necessary to overcome her burden for equitable tolling, respondent argues the Chief Special Master did not err in finding petitioner did not meet the first element. *Id.*

Respondent further argues petitioner does not meet the extraordinary circumstances element. *See id*. at 14–15. Respondent argues *Mojica* is factually distinguishable because here petitioner has not established the Court's filing system malfunctioned, petitioner waited to file until three hours before the deadline, and counsel failed to act diligently. *Id*. at 13–16 (citing *Mojica*, 102 Fed. Cl. at 100–01). Respondent additionally rejects the *Mojica* comparison by a "possible" PACER outage, stating petitioner relies on a speculative theory rather than clearly distinguished errors from *Mojica*. *Id*. at 15 (citing *Mojica*, 102 Fed. Cl. at 100–01). In sum, respondent asserts petitioner did not establish equitable tolling was warranted and therefore the Chief Special Master did not err in rejecting the use of equitable tolling. *Id.* at 17.

**VI.     Whether Petitioner's Onset Occurred before 4 October 2018**

The parties dispute whether the Chief Special Master correctly determined when the manifestation of onset or symptoms started, triggering the running of the statute of limitations. In a related argument, the parties disagree whether the Chief Special Master should have heard evidence on the issue. Regarding the parties' disagreement over the date of petitioner's onset, the Court examines whether the Chief Special Master erred in determining the onset occurred before 4 October 2018. Next, the Court determines if the Chief Special Master erred in not conducting an evidentiary hearing or allowing additional evidence about the onset date.

**A.     Whether the Chief Special Master Erred in Determining the Date of Onset**

The primary dispute is whether the Chief Special Master erred in determining the onset occurred before 4 October 2018. At oral argument, the parties further defined the dispute: whether dizziness is a symptom of cerebellar ataxia. Tr. at 70:20–21 ("[PETITIONER]: [W]e argued that dizziness was not a symptom of ataxia."). Related to dizziness as a symptom of cerebellar ataxia, petitioner argues the medical records are ambiguous and the Chief Special Master misinterpreted the medical records. Tr. at 25:13–24 ("THE COURT: So, . . . there . . . might be some confusion in the medical records . . . . [PETITIONER]: Correct. And all the evidence in the medical records comes from the plaintiff telling them that, I felt a little dizzy on the ride home, and that's in her . . . affidavit . . . . THE COURT: So, the Chief Special Master's interpretation of the medical records might be just confusing then? [PETITIONER]: Correct."), 38:25–39:7 ("THE COURT: So, [petitioner], is it your position that Dr. Satyan is mischaracterizing what Dr. Sundaram had previously said? [PETITIONER]: Correct. And that [Dr. Satyan] may be attributing [the dizziness] to her MS more than the ataxia. THE COURT: Ongoing MS symptoms versus acute ataxia? [PETITIONER]: Yes."). Petitioner alternatively argued if dizziness was a symptom, the dizziness on 2 October 2018 would not trigger the statute of limitations because it lacked the necessary severity. Tr. at 17:3–14 ("THE COURT: So, you disagree then that if dizziness is a symptom of [cerebellar ataxia], it does not trigger the statute of limitations? [PETITIONER]: Correct. THE COURT: Okay. Well, what does trigger then? [PETITIONER]: A more substantial [and] unique symptom. THE COURT: So, the distinction then is a substantial symptom versus any symptom? [PETITIONER]: A unique and more substantial symptom, yes . . . ."). The government maintained the medical records indicate Ms. Huntoon's treating physicians considered dizziness a symptom of cerebellar ataxia and the manifestation of dizziness on 2 October 2018 triggered the start of the statute of limitations. *See*

Tr. at 56–57:21–1 ("[RESPONDENT]: . . . Respondent's position is that the dizziness was a symptom of the [cerebellar ataxia].  THE COURT:  Because of the medical records? [RESPONDENT]:  Yes.").  The Court first addresses whether the Special Master erred in finding dizziness was a symptom of cerebellar ataxia.  Then, the Court examines if dizziness on 2 October 2018 would have triggered the statute of limitations.

1. **Whether Dizziness Is a Symptom of Cerebellar Ataxia**

Section 16(a)(2) of the Vaccine Act, states "no petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of occurrence of the first symptom *or* manifestation of onset or of the significant aggravation of such injury . . . ."  42 U.S.C. § 300aa-16(a)(2) (emphasis added).  The Federal Circuit has explained "[a] symptom may be indicative of a variety of conditions or ailments, and it may be difficult for lay persons to appreciate the medical significance of a symptom regarding a particular injury.  A manifestation of onset is more self-evident of an injury and may include significant symptoms that clearly evidence an injury."  *Markovich v. Dep't of Health and Hum. Servs.*, 477 F.3d 1353, 1357 (Fed. Cir. 2007).

In the Chief Special Master's decision, he stated, "it appears on this record that treaters considered Petitioner's complains [sic] of dizziness to represent ataxia."  Decision Granting Resp't Mot. to Dismiss at 5.  In support of the inference, the Chief Special Master looked to the medical records and a website from the Mayo Clinic.  *Id.* (citing Pet'r Ex. 2 at 187, 192; Pet'r Ex. 3 at 355, 370–71; Pet'r Ex. 20 at 1; Ataxia:  Symptoms & causes, *supra*.  Petitioner at oral argument alleged the Chief Special Master's interpretation of the medical records was confusing. Tr. at 25:21–24 ("THE COURT:  So, the Chief Special Master's interpretation of the medical records might be just confusing then?  [PETITIONER]:  Correct.").  Respondent argued the medical records support dizziness as a symptom of cerebellar ataxia and the Chief Special Master need only rely on the medical records.  *See* Tr. at 26:6–28:21 (describing the medical records from 4 October 2018), 56:21–25 ("[RESPONDENT]: . . . Respondent's position is that the dizziness was a symptom of the [cerebellar ataxia].  THE COURT:  Because of the medical records?  [RESPONDENT]:  Yes.").

Ms. Huntoon's medical records, like many medical records, could use more precision.  At oral argument, petitioner argued the medical records from Dr. Sundaram incorrectly characterize the dizziness as ongoing from 2 October 2018.  *See* Tr. at 25:13–24.  Further, petitioner asserted Ms. Huntoon "testified in her affidavit and would testify at a hearing that her excessive dizziness started on [4 October 2018]."  Tr. at 30:10–12.  Under the heading "Multiple Sclerosis," Dr. Sundaram's progress notes from Ms. Huntoon's 4 October 2018 neurology visit to state:  "On Tuesday[,] she got the flu shot and has been having excessive dizziness which has not subsided." Pet'r Ex. 2 at 187.  Petitioner's affidavit states, "On October 4, 2018, I felt extremely dizzy and off-balance when I woke up.  I had an appointment with my neurologist, Dr. Bharathy Sundaram, at Texoma Neurology Associates . . . to treat my multiple sclerosis . . . , which was in remission at the time.  I told Dr. Sundaram that I had felt very dizzy all morning . . . ."  Huntoon Aff. ¶ 3, ECF No. 12-1.  Ms. Huntoon's affidavit also states, "On October 2, 2018, I received the flu vaccine . . . .  On the way home from the doctor's office, I felt somewhat dizzy but otherwise alright."  *Id.* ¶ 2.  While petitioner's affidavit does not detail whether her dizziness was ongoing

after the flu vaccination, petitioner's affidavit and the medical records from Dr. Sundaram both refer to dizziness occurring on at least 2 October 2018 and 4 October 2018 and therefore are not in conflict.  *See* Pet'r Ex. 2 at 187; Huntoon Aff. ℙ 3.

    The Chief Special Master relied on the medical records to infer the treating physicians categorized dizziness as a symptom of cerebellar ataxia.  Decision Granting Resp't Mot. to Dismiss at 5 (citing Pet'r Ex. 2 at 192; Pet'r Ex. 3 at 355, 357, 370).  Petitioner at oral argument contended dizziness is not a symptom of ataxia.  Tr. at 70:20–21 ("[PETITIONER]:  [W]e argued that dizziness was not a symptom of ataxia.").  Under the heading "Acute cerebellar ataxia," petitioner's neurologist, Dr. Sundaram, states, "Patient was seen [on 4 October 2018] and examined in detail.  She has acute onset of vertigo, gait changes, headache, fever[,] and also extreme fatigue.  The exam is showing cerebellar findings.  Hence, I . . . sent her to the ER[—]after talking to the ER[—]for the cerebellar inflammation post vaccination related changes."  Pet'r Ex. 2 at 192.  The medical notes from Dr. Betha, petitioner's admission evaluator at TMC, indicate petitioner came to the ER on 4 October 2018 for "dizz[iness] [and] generalized weakness."  Pet'r Ex. 3 at 355.  Dr. Betha noted, "Patient received [a] flu shot 2 days ago [on 2 October 2018,] and[,] since then[,] she has been having dizziness.  She denies dizziness at rest but when she gets up from the bed or . . . the bathroom commode[,] she feels extremely dizzy."  *Id.*  Dr. Betha diagnosed Ms. Huntoon with "Ataxia . . . [a]ssociated with dizziness."  *Id.* at 357.  The following day, during an inpatient neurology consultation, Dr. Satyan, TMC's neurologist, noted:

> The patient got [the] flu injection on Tuesday [, 2 October 2018—]4 days ago[—]and after that, the patient did not feel well. . . . After coming home[,] she started feeling dizzy[—]on the way also she was dizzy.  She went to bed.  The next thing when she got up to go to the bathroom, she had to hold onto something[,] and she was very dizzy . . . .  With all these symptoms, the patient did see [neurologist] Dr. B. Sundaram in [his] office yesterday[,] and Dr. B. Sundaram suspected that the patient was having acute cerebellar ataxia due to [the] flu injection and . . . sent [her] to the emergency room for further evaluation.

*Id.* at 370 (emphasis added).  The three medical records from 4 October 2018 and 5 October 2018 corroborate the three physicians' opinions dizziness was indicative of cerebellar ataxia.  *See* Pet'r Ex. 2 at 192; Pet'r Ex. 3 at 355, 357, 370.  It is not the Court's role "to reweigh the factual evidence, or to assess whether the special master correctly evaluated the evidence."  *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000) (quoting *Munn v. Sec'y of Dept. of Health & Hum. Servs.*, 970 F.2d 863, 871 (Fed. Cir. 1992)).  As the medical records reasonably support finding dizziness as a symptom of cerebellar ataxia, the Chief Special Master did not err in using the start of dizziness on 2 October 2018 as the trigger for the statute of limitations.  *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (quoting *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993)) ("Medical records are generally 'trustworthy' because they 'contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.'"); *Lampe*, 219 F.3d at 1360 (quoting *Munn*, 970 F.2d at 871).

In addition to relying on the medical records and the physicians' treatment of dizziness as a symptom of cerebellar ataxia, the Chief Special Master referenced an informational website from the Mayo Clinic about ataxia. Decision Granting Resp't Mot. to Dismiss at 5 (citing Ataxia: Symptoms & causes, *supra*. Petitioner objects to the Chief Special Master's use of the Mayo Clinic website to support dizziness as a symptom of cerebellar ataxia. Pet'r Mem. in Supp. of Mot. for Review at 8. The Court finds Ms. Huntoon's medical records alone were a sufficient basis for the Chief Special Master's determination dizziness was a symptom of cerebellar ataxia. *Kirby*, 997 F.3d at 1382; *Lampe*, 219 F.3d at 1360 (quoting *Munn*, 970 F.2d at 871). Therefore, the Chief Special Master did not need to examine external content from the Mayo Clinic.[2] *See* Tr. at 56:21–57:1 ("[RESPONDENT]: . . . Respondent's position is that the dizziness was a symptom of the [cerebellar ataxia]. THE COURT: Because of the medical records? [RESPONDENT]: Yes.").

### 2. Whether the Statute of Limitations Was Triggered Before 4 October 2018

Throughout oral argument, petitioner argued different positions on what triggers the statute of limitations. *See* Tr. at 17:3–14, 61:24–62:1. Initially, petitioner stressed the severity of the dizziness on 4 October 2018 because petitioner suggests a "more substantial [and] unique symptom" is needed to trigger the statute of limitations. *See* Tr. at 17:3–14. On the other hand,

---

[2] The parties dispute the use of the Mayo Clinic website to support dizziness as a symptom of cerebellar ataxia. Petitioner asserted dizziness is not a listed symptom on the website. Pet'r Mem. in Supp. of Mot. for Review at 8. Respondent argued a line from a connecting page to the Mayo Clinic website—albeit a distinct Uniform Resource Locator ("URL")—supports dizziness as a symptom of cerebellar ataxia: "Other symptoms such as stiffness, tremor and dizziness might improve with treatments." Resp't Resp. to Pet'r Mot. for Review at 9–10 (citing Ataxia: Symptoms & causes, *supra*). The URL cited by the Chief Special Master does not list dizziness as a symptom of general cerebellar ataxia. Decision Granting Resp't Mot. to Dismiss at 5 (citing Ataxia: Symptoms & causes, *supra*). Respondent could not confirm whether the website had changed since the time the Chief Special Master cited it. Tr. at 64:9–11 ("THE COURT: So, you're not sure if the website changed or if the citation was wrong or what? [RESPONDENT]: I'm not sure, no."). Therefore, the Court is skeptical of the Chief Special Master's reliance on the Mayo Clinic website. In *Campbell v. Secretary of Health and Human Services*, this court addressed a similar issue. 69 Fed. Cl. 775, 780 (2006). In *Campbell*, petitioners alleged the Special Master abused her discretion by "adding, *sua sponte*, to the record, three weeks before her decision, a number of articles taken from the Internet without providing petitioners an adequate opportunity to respond to those documents." *Id.* at 779. The court questioned the reliability of the websites, especially when being used to preponderantly prove causation. *Id.* at 781. The court ultimately found "not only the Special Master's initial reliance on the articles in questions, but also the half steps she purportedly took after introducing those articles into the record" were "patently unfair." *Id.* at 782. As in *Campbell*, the Chief Special Master's citation to the Mayo Clinic general website is precarious because the website (1) attributes the publication to "Mayo Clinic Staff" rather than a medical professional by name; and (2) does not provide link specific medical literature with paragraphs or sentences, but rather generally references medical literature and other websites. *Campbell*, 69 Fed. Cl. at 779–82; *Ataxia: Symptoms & causes*, MAYO CLINIC (Apr. 9, 2022), https://www.mayoclinic.org/diseases-conditions/ataxia/symptoms-causes/syc-20355652; *see also* Chhaya Divecha, Milind S Tullu & Sunil Karande, *The art of referencing: Well begun is half done!*, 69 J. OF POSTGRADUATE MED. 1 (2023) (noting The British Standards Institution defines reference as "a set of data describing a document, sufficiently precise and detailed to identify it and enable it to be located"). Indeed, respondent agreed the website was suspect. Tr. at 51:8–12 ("THE COURT: But you agree that there's a difference between citing a generic website versus citing a published medical article that has an attributable author? [RESPONDENT]: Absolutely."), 64:12–14 ("THE COURT: Is that one reason why we shouldn't cite websites? [RESPONDENT]: I wouldn't personally."). Nevertheless, the Chief Special Master's citations to the Mayo Clinic website does not change the outcome because the medical records and the physicians' treatment of dizziness sufficiently support the notion dizziness is a symptom of cerebellar ataxia. *See supra* Section VI.A.1

petitioner confirmed a significant shift in symptom severity "doesn't matter." Tr. at 61:24–62:1 ("THE COURT: So, a significant shift in symptoms . . . that doesn't matter? [PETITIONER]: No, it does not."). Respondent maintained any symptom associated with the alleged injury, even if subtle, is a triggering symptom under that Vaccine Act. Tr. at 18–19:24–2 ("THE COURT: [A] subtle symptom is a symptom, [and] a symptom triggers the statute of limitations? [RESPONDENT]: Exactly.").

Case law confirms any symptom associated with the alleged injury, even if subtle, is a triggering symptom under the Vaccine Act. The Federal Circuit has held "it is the first symptom or manifestation of an alleged vaccine injury, not first date when diagnosis would be possible, that triggers the statute of limitations under [42 U.S.C.] § 300aa–16(a)(2)." *Carson ex rel. Carson v. Sec'y of Health & Hum. Servs.*, 727 F.3d 1365, 1369 (Fed. Cir. 2013). The Federal Circuit held Congress "chose to trigger the statute of limitations from the date of the occurrence of the first symptom or manifestation of onset of an injury, not from the date of the injury itself." *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1326 (Fed. Cir. 2011). Accordingly, "the statute of limitations begins to run on a specific statutory date: the date of occurrence of the first symptom *or* manifestation of onset of the vaccine-related injury recognized as such by the medical profession at large." *Id*. at 1340 (emphasis added).

The Court, at oral argument, used a hypothetical to illustrate the rigidity of the law:

> The petitioner receives a vaccine on 1 January 2000 and starts experiencing tingling in her hands. In the three years following the vaccination, the tingling progresses, and the petitioner notices frequent runny noses. Doctors are confounded until the petitioner visits a neurologist on 1 January 2004 when this doctor associates the tingling sensation and the runny nose with the vaccine. In the hypothetical, the vaccine injury is Guillain-Barré syndrome ("GBS"), a rare neurological disorder leading to quadriplegia. A runny nose and drooling are also associated with the hypothetical type of severe GBS.

*See* Tr. at 19:15–21:21, 59:4–61:4. The hypothetical illustrated two points. First, despite the differences in severity and subtly in the two symptoms—a runny nose and paralysis—the manifestation of any of the symptoms triggers the statute of limitations. *Cloer*, 654 F.3d at 1335, 1340; Tr. at 60:14–16 ("[RESPONDENT]: [I]f the runny nose is seen as a symptom of GBS, that statute would have started to run when that symptom started."). The parties agree. Tr. at 60:14–16 (respondent agreeing), 61:3–18 (petitioner agreeing). In the hypothetical, once the petitioner experienced a runny nose, the statute of limitations started. Second, the injury does not have to be a confirmed vaccine-caused injury for a symptom of the vaccine injury to trigger the statute of limitations. *Cloer*, 654 F.3d at 1335, 1340. The parties agree. Tr. at 61:4–14 ("[PETITIONER]: That's what *Cloer* says, Your Honor, I agree. THE COURT: You agree that's what the law says? [PETITIONER]: Yes, sir. THE COURT: [T]he first basic symptom of an injury, even if not properly diagnosed or rising to the level of significant for treatment, [at that point] the statute of limitations has started ticking? [PETITIONER]: Yes, as long as it's a symptom that led to that condition."), 24:2–22 ("THE COURT: [W]ell . . . , if we're within the statute of limitations, that there was no vaccine injury . . . is what it would be argued for later. But the point [respondent is] making, I think, is that the dizziness experienced on 2 October 2018

and discussed on 4 October 2018 was part of the diagnosis for [cerebellar ataxia] which makes it part of the symptoms of [cerebellar ataxia], which makes it trigger the statute of limitations. [RESPONDENT]: Correct, yes."). A petitioner could think hand tingling was due to falling asleep wrong, but the statute of limitations would still run if the hand tingling was associated with GBS. While the contours of the law create harsh consequences—in this case a common, subtle symptom starting the statute of limitations clock—it is not the role of the courts to redraw the boundaries of the law. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: INTERPRETATIONS OF LEGAL TEXTS, at v (2012) (including the medieval legal maxim translated to "[h]old tight to the words of the law"); *see also Lamie v. United States Tr.*, 540 U.S. 526, 538 (2004) ("Our unwillingness to soften the import of Congress' chosen words even if we believe the words to lead to a harm outcome is longstanding.").

Applying the principles of the hypothetical and *Cloer* to the case here, dizziness as a symptom of cerebellar ataxia would have triggered the statute of limitations. *Cloer*, 654 F.3d at 1335, 1340; *see supra* Section VI.A.1. As the Chief Special Master noted, petitioner stated to "multiple treaters []and . . . reiterated in [her] affidavit," petitioner's dizziness, a symptom of cerebellar ataxia, started on 2 October 2018, the day she received the flu vaccine. Decision Granting Mot. to Dismiss at 5. The Chief Special Master also cited the first diagnosis of cerebellar ataxia on 4 October 2018 and concluded "petitioner's symptoms had to of manifested by [4 October 2018]." *Id.* (citing Pet'r Ex. 2 at 187, 192; Pet'r Ex. 3 at 355, 370–71; Pet'r Ex. 20 at 1). In other words, if petitioner was diagnosed with cerebellar ataxia on 4 October 2018, as medical records indicate, onset occurred before 4 October 2018; therefore, the statute of limitations triggered on 2 October 2018 or before 4 October 2018. *See* Decision Granting Resp't Mot. to Dismiss at 5 (citing Pet'r Ex. 2 at 187, 192; Pet'r Ex. 3 at 355, 370–71; Pet'r Ex. 20 at 1). The medical records support the Chief Special Master's factual determinations, and it is not the Court's role to reweigh evidence on appeal. *Burns v. Sec'y of Dep't of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (finding it is the special master's discretion in weighing contemporaneous medical records to other evidence for a rational decision); *Kirby*, 997 F.3d at 1382. Accordingly, the Court finds no error in the Special Master's factual finding of petitioner's onset before 4 October 2018. 42 U.S.C. § 300aa-16(a)(2); *Cloer*, 654 F.3d at 1340.

### B.     Whether the Chief Special Master Erred by Not Conducting a Hearing

Petitioner at oral argument clarified the Chief Special Master erred in deciding on the record, without a hearing. *See* Tr. at 75:6–14 ("[PETITIONER: The error was deciding the motion on the papers without having a hearing."). Petitioner argued the medical records were inconsistent, so the Chief Special Master should have conducted an evidentiary hearing to understand the medical records. Tr. at 37:10–12 ("[PETITIONER]: If anything, there's a conflict in the record in [what] [Dr. Satyan] is saying."), 75:6–14 ("[PETITIONER: The error was deciding the motion on the papers without having a hearing."). Additionally, petitioner argued an evidentiary hearing was needed to understand which symptoms of cerebellar ataxia would trigger the statute of limitations. *See* Tr. at 52:1–7 ("[RESPONDENT]: It's my position that if [the Chief Special Master] heard experts testify, he would hear different experts probably cite different articles, some of which might contain dizziness, some of which do not. . . . [H]e would listen to those experts, judge their credibility, and then determine whether dizziness was the first symptom.").

VRCFC Rule 8(f) states:  "Any fact or argument not raised specifically in the record before the special master will be considered waived and cannot be raised by either party in proceedings on review of a special master's decision."  As discussed *supra* Section VI.A.1, the medical records could have been clarified; respondent agrees.  Tr. at 39:18–40:11 ("THE COURT:  [I]f Dr. Sundaram testified, it could be cleared up pretty quickly, right? [RESPONDENT]:  I suppose, but I don't think there's enough conflict in the records that would necessitate a deposition or a hearing.  THE COURT:  Well, let's say Dr. Sundaram testifies that . . . the notes under the heading "MS" were ongoing history notes, and the diagnosis five pages later related to ataxia—the items that were listed there—were a closed list of what was used to diagnose ataxia [related to] the symptoms for ataxia. . . .  [W]ould [that] clarify things? [RESPONDENT]:  It might, but I think [the] Chief Special Master . . . used the information he had, and his decision wasn't arbitrary and capricious based on these records.").  Petitioner, however, did not argue before the Chief Special Master the medical records were inconsistent or request the treating physicians testify.  *See* Pet'r Resp. to Resp't Mot. to Dismiss.  Further, petitioner did not request a hearing.  Tr. at 74:14–16 ("THE COURT:  So, you agree that you do not request a hearing, correct?  [PETITIONER]:  Yes.").  Petitioner asserted at oral argument the first page of petitioner's response to respondent's Motion to Dismiss alludes to the need for expert testimony and a hearing.  Tr. at 65:24–66:3 ("[PETITIONER]:  On the very first page of my response, I say that 'Petitioner will only address the first issue regarding statute of limitations because the Special Master has not yet ordered the parties to obtain experts to speak on causation.'").  Petitioner also agreed a hearing for expert testimony would not be helpful because, as petitioner recognized, expert testimony would not be able to refute the medical records, which evidence dizziness as a symptom.  Tr. at 74:22–75:5 ("[PETITIONER]:  [I]n [paragraph] 23 [of the response to respondent's Motion to Dismiss, ECF No. 24], I do talk about needing an expert to talk about when ataxia could have arisen from a vaccination and that being days after, but not related to the medical records, no sir.  THE COURT:  But mentioning . . . an expert testifying about [cerebellar ataxia] is different than stating that petitioner's testimony would refute the characterization of the records.  [PETITIONER]:  That's true."); *see supra* Section VI.A.1.  In sum, petitioner did not request a hearing, did not argue inconsistencies in the medical records warranting testimony from the treating physicians, and agreed expert testimony would not refute the medical records.  Pursuant to VRCFC 8(f), the Court cannot entertain "arguments not raised specifically in the record before the [S]pecial [M]aster"; therefore, petitioner's objection to the Chief Special Master not holding an evidentiary hearing is waived.  *Weddel v. Sec'y of Health & Hum. Servs.*, 23 F.3d 388, 290 n.2 (Fed. Cir. 1994) ("The government correctly observes that the [petitioners] failed to raise before the Special Master the substantive due process and equitable tolling arguments they now press.  Congress has expressly forbidden us to consider such arguments.").

### VII. Whether Petitioner's Claim is Subject to Equitable Tolling

As the Chief Special Master found the onset occurred before 4 October 2018, Section 16(a)(2) of the Vaccine Act required petitioner to file before 4 October 2021 based on the medical record.  Decision Granting Resp't Mot. to Dismiss at 5 (citing 42 U.S.C. § 300aa-16(a)(2)); *see supra* Section VI.A.  Petitioner asks for equitable tolling in order to accept the 5 October 2021 filing as filed on 4 October 2021.  Tr. at 76:2–5 ("THE COURT:  [B]ased on your

request, equitable tolling would only credit the [4 October 2021] filing, correct? [PETITIONER]: That's correct."). Petitioner agreed at oral argument if the Chief Special Master's findings are sustained, equitable tolling would not cure the late filing of the petition.[3] Tr. at 75:20–76:1 (THE COURT: [I]f the Chief Special Master . . . found that onset was before 4 October 2018, then the last day that petitioner could file was 3 October 2021, correct? [PETITIONER]: Or [2 October 2021] if the Chief Special Master found it was starting on [2 October 2018]."). As the Court has determined the Chief Special Master did not err in finding the onset of the cerebellar ataxia was before 4 October 2018, the Court need not address the issue of equitable tolling. *See supra* Section VI.A

## VIII. Conclusion

For the reasons above, the Court **DENIES** petitioner's Motion for Review, ECF No. 28, and **SUSTAINS** the Chief Special Master's 31 January 2023 Decision Granting Motion to Dismiss, ECF No. 26. The Court **DIRECTS** the Clerk to enter judgment pursuant to the Chief Special Master's Decision Granting Motion to Dismiss, ECF No. 26.

**IT IS SO ORDERED.**

s/ Ryan T. Holte<br>
RYAN T. HOLTE<br>
Judge

---

[3] The Court notes where a day-late filing can result in harsh consequences for an injured petitioner, it is best practice to file weeks in advance; petitioner agreed. Tr. at 84:24–85:17 ("THE COURT: [W]hy not file a week early or a couple days early or something? [PETITIONER]: We could have done that. THE COURT: So, there was no immediate prohibition that was preventing it. . . . I guess, why were you concerned to file on [4 October 2021]? [PETITIONER]: Because that's when we believed the [cerebellar ataxia] was diagnosed and when the first symptom arose, and it was on the calendar for that day to get it filed. . . . But I don't believe the standard should be why didn't you file it a week earlier . . . . THE COURT: Well, best practice maybe. [PETITIONER]: Yes, sir, I agree with that.").